AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
03/26/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___AP___ DEPUTY



FILED
CLERK, U.S. DISTRICT COURT
03/26/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___RAM___ DEPUTY

UNITED STATES OF AMERICA,

v.

MIGUEL ANGEL LOPEZ PRADO,

Defendant.

Case No.   5:25-mj-00147

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. Beginning on March 25, 2025, in the county of Riverside in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | See attached affidavit. |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/
Complainant's signature

HSI Special Agent, An Do
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  March 26, 2025

*Judge's signature*

City and state:  Riverside, California

Honorable David T. Bristow, U.S. Magistrate Judge
*Printed name and title*

AUSA: John A. Balla (951-276-6246)

**AFFIDAVIT**

I, An Do, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Miguel Angel LOPEZ PRADO ("LOPEZ") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii): Possession with Intent to Distribute at Least 500 Grams of a Mixture or Substance Containing a Detectable Amount of Methamphetamine.

2. This affidavit is also made in support of an application for a warrant to search a digital device, a black iPhone 16 Pro Max, in the custody of Homeland Security Investigations ("HSI") in San Bernardino, California, as described more fully in Attachment A (the "SUBJECT DEVICE").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and it does not purport to set forth all of my knowledge of or investigation into this matter.  Unless

specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5. I am a Special Agent ("SA") with HSI within the U.S. Department of Homeland Security since July 2021. I am currently assigned to the HSI Office of the Assistant Special Agent in Charge in Riverside, California, part of HSI Office of Special Agent in Charge Los Angeles. My duties as a HSI SA included apprehension, or detention of, individuals suspected or convicted of offenses against the laws of the United States, and conducting investigations into violations of federal laws, which includes, but not limited to, Title 8-Immigration, 19-Customs, 21-Controlled Substances, 18-General, and other laws relating to the Homeland Security Act of 2002 and the Maritime Drug Law Enforcement Act. Through my training, I have learned of HSI's criminal investigative authority, as well as investigative techniques. During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Central District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers. I have assisted in the execution of search warrants to seize evidence of violations of federal and state law to apprehend individuals who have

committed such violations. I am familiar with how drug traffickers, exporters, and smugglers, use digital devices and international mail to facilitate and conceal their crimes.

6. I am a federal law enforcement officer as defined in 5 U.S.C. § 8401(17) with added definition and powers derived from 8 U.S.C. § 1357(a)(5)(A) and 19 U.S.C. § 1401(i), an "immigration officer" and a "customs officer," respectively. At the core of these definitions, I am authorized to "execute and serve any order, warrant, subpoenas, summons, or other process issued under the authority of the United States; make an arrest without a warrant for any offense against the United States committed in the officer's presence or for a felony, cognizable under the laws of the United States committed outside the officer's presence if the officer has reasonable grounds to believe that the person to be arrested has committed or is committing a felony." In addition, under 19 U.S.C. § 482, as a "customs officer," I am authorized to stop, search, and examine any vehicle, beast, or person, on which or whom I shall suspect there is merchandise, which is subject to duty, or shall have been introduced into the United States in any manner contrary to law.

7. Prior to working for HSI, from 2020 to 2021, I worked as a United States Customs and Border Protection Officer ("CBPO"). As a CBPO, I received training on techniques, methodologies, and operational habits of narcotics trafficking organizations. I have successfully conducted operations to

mitigate the elicit movement of people, merchandise, and contraband contrary to law.

8.  As for my training, experience, and education, I have successfully completed an initial eighteen-week U.S. Customs and Border Protection Field Operations Academy training, completed an eleven-week Criminal Investigator Training Program, and a fourteen-week HSI SA Training, all at the Federal Law Enforcement Training Center in Brunswick, GA.  The fundamental training encompassed instruction on investigative techniques and received hundreds of hours of comprehensive, formalized instruction into drug trafficking, drug smuggling, human trafficking, money laundering, street gangs, trade fraud, asset identification, seizure, forfeiture, interviewing, police tactics, federal criminal justice procedures, undercover operations, and investigations into violations of federal laws. In 2013, I earned a bachelor's degree in psychology from a California State University.

9.  I have conducted and participated in numerous investigations into crimes involved in trafficking of controlled substances, firearms, and laundering of proceeds derived from controlled substances, other specified unlawful activities as the lead investigator and in a supporting role to other investigations lead by other agents and officers.  I have been involved in investigations concerning the unlawful manufacture, cultivation, possession, distribution, and transportation of controlled substance offenses, in violation of 21 U.S.C. §§ 841 and 846.  I have participated in different aspects of

investigations, including, but not limited to, physical surveillances, electronic surveillances, physical and digital evidence gathering, undercover operations, source gathering, informant handling, and execution of search and arrests warrants, which resulted in the apprehension of suspects, firearms, seizure of narcotics, real property, and proceeds.

10. Furthermore, through my training, education, experience, conversations with other case agents, senior narcotics officers, debriefing of confidential sources (informants), interviewing of defendants, suspects, and witnesses, whom have personal knowledge of trafficking-controlled substances, I have become familiar with the tactics and measures which drug traffickers obtain, conceal, possess, transport, and/or sell controlled substances. I have also become acquainted to the methods, language, and terms used by drug traffickers and members of organized crime.

### III. SUMMARY OF PROBABLE CAUSE

11. On March 25, 2025, LOPEZ was stopped by U.S. Border Patrol Agents ("BPAs") driving on I-15 north in Temecula, California, a few hours after he crossed into the United States from Mexico. BPAs found approximately 20.5 kilograms of methamphetamine and the SUBJECT DEVICE in the vehicle. In a Mirandized interview, LOPEZ admitted that he traffics drugs for the Cartel de Jalisco Nueva Generacion ("CJNG") drug cartel in Mexico and that he has smuggled drugs into the United States numerous times before. He also admitted that he uses the SUBJECT DEVICE to communicate with CJNG.

## IV. STATEMENT OF PROBABLE CAUSE

12. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. Border Patrol Stop

13. On March 25, 2025, BPAs assigned to the Newton-Azrak Border Patrol Station Strike Team were conducting targeted enforcement and anti-smuggling operations within the Newton-Azrak Border Patrol area of responsibility. Agents routinely conduct their enforcement activities along the I-15 smuggling corridor. This area is located approximately 70 miles from the United States/Mexico International Border and is a well-known and documented corridor used by illegal entrants and smugglers to transport their illicit cargo north into the interior of the United States.

14. At approximately 10:30 a.m., BPA Salvador Pinones and his canine partner Loki were driving in an unmarked Border Patrol Chevy Silverado canine truck, both trained and certified in the detection of concealed humans, narcotics, and narcotics derivatives. BPA Pinones was travelling I-15 northbound approximately .25 miles north of Deer Springs Road when he noticed a black Jeep Cherokee ("V-1") in lane one pass his position.

15. BPA Pinones conducted record checks on his DHS issued laptop which revealed V-1 was registered out of Sacramento, California. Record checks revealed the vehicle and LOPEZ had entered the United States through the San Ysidro Port of Entry

("SYS POE") at approximately 7:42 a.m. that day. BPA Pinones noticed V-1 has been in the United States for 3 hours and knows it takes approximately takes 50 minutes to an hour of drive time from the SYS POE to its current location in Bonsall, California. BPA Pinones has experience with this type of downtime from previous smuggling loads where the smuggler crossed the international border and were provided specific instructions as to when and where to go after crossing the POE. BPA Pinones observed crossing history whereby the subject had several crossings into and out of the POE within short periods of time. The crossing history revealed LOPEZ crossed nearly every day for the past month during different hours of the day and without any consistency. BPA Pinones knows that drug-trafficking organizations will often instruct smugglers to repeatedly cross vehicles through the POEs to build rapport with the officers and establish a crossing pattern, typically to avoid law enforcement scrutiny.

16. BPA Pinones pulled behind V-1 in lane one. BPA Pinones noticed V-1 made an unnecessary lane change to lane two. As soon as the BPA pulled behind V-1 again, it made another unnecessary lane change to lane one. The driver conducted this maneuver three more times. BPA Pinones had seen this type of driving maneuver from previous smuggling loads. Smugglers often conduct lane changes to create distance from any following vehicles to evade law enforcement.

17. While V-1 was in lane two, the BPA maneuvered to lane three to gain a better view of the driver. BPA Pinones noticed

7

the driver had on a bright green construction shirt. BPA Pinones found it unusual for an apparent construction worker to not be at a worksite at that time of day. BPA Pinones has experience from previous smuggling loads where subjects often present themselves as construction employees travelling to work.

    18.   Due to record checks and driving behavior, BPA Pinones decided to conduct a vehicle stop for further investigation. He activated his emergency overhead lights, and V-1 yielded just north of the Temecula Border Patrol checkpoint in Temecula, California. BPA Pinones was then assisted by BPA Jose Zamora to ensure a safe encounter with V-1.

    19.   BPA Pinones approached the passenger side of the vehicle and identified himself as a BPA to the driver and sole occupant, later identified as LOPEZ. During initial conversation with LOPEZ, he told BPA Pinones that he crossed the border around 5 a.m. and that he is the owner of V-1. Due to the loud highway noise, BPA Pinones asked LOPEZ to step out of the vehicle, and LOPEZ complied. During continued conversation with BPA Pinones, LOPEZ stated that he does concrete work for his uncle and that he is from Sacramento originally but has resided in Tijuana for the past month and a half. When asked to provide a driver's license, LOPEZ tells BPA Pinones that he does not have a California license due to tickets he planned to take care of on the day of the encounter. LOPEZ then presented BPA Pinones with a Washington license. LOPEZ then stated that he checked out a job in San Diego and was going to his cousin's house. LOPEZ added he currently resides in Tijuana because the

8

rent is cheaper. LOPEZ stated he is responsible for everything in V-1 and that V-1 is always in his possession.

20. BPA Pinones asked LOPEZ what he did after he crossed into the United States. LOPEZ stated he was checking out a job and then going to his uncle's house. BPA Pinones found it odd LOPEZ initially stated he was visiting his cousin but then stated he was going to visit his uncle. BPA Pinones asked LOPEZ for his uncle's first name, and LOPEZ hesitated before replying, "Oscar." BPA Pinones asked LOPEZ for his uncle's last name, and LOPEZ hesitated again and replied, "Rodriguez." When asked where his uncle lives, LOPEZ hesitated to think and replied, "El Monte." BPA Pinones found it odd that LOPEZ had to think about his family member's name and where he lived. When asked why LOPEZ did not take the 5 freeway since it is closer to El Monte, LOPEZ then stated that he was going to Victorville.

21. Due to LOPEZ's inconsistent story, BPA Pinones asked LOPEZ for consent to search his vehicle and conduct a canine sniff of the exterior and interior of V-1. LOPEZ consented to the vehicle search and canine sniff of V-1. BPA Pinones advised LOPEZ that his canine is trained in the detection of the odor of concealed humans and narcotics. BPA Pinones then asked if there is anything like that in the vehicle, to which LOPEZ responded, "No."

22. BPA Pinones retrieved his canine partner Loki and proceeded to conduct the canine sniff. Loki alerted to the front of the vehicle. BPA Pinones advised LOPEZ of the alert. LOPEZ stated to BPA Pinones, "I did have marijuana in the

vehicle but there is none right now." BPA Pinones conducted a hand search of V-1.

23. The search revealed 32 cellophane wrapped bundles of suspected narcotics concealed in the vehicle's firewall (a common hiding spot for drug couriers). A further search also revealed a GPS tracking device in the vehicle, which is consistent with co-conspirators tracking a drug load. BPA Pinones advised BPA Zamora of the discovery, and BPA Zamora placed LOPEZ under arrest. V-1, LOPEZ, and the suspected narcotics were transported to the Murrieta Border Patrol Station for further processing.





24. Also in V-1, BPAs found the SUBJECT DEVICE affixed to a mount. The SUBJECT DEVICE was using a maps app to navigate to a destination.

25. Border Patrol contacted HSI Riverside to respond and take over the investigation. SA Geovanni Cuevas and Task Force Officer ("TFO") Carlos Fregoso of HSI Riverside's Inland Empire Border Enforcement Security Taskforce responded to the station to interview LOPEZ and continue the investigation.

**B.   LOEPZ's Interview**

26. At approximately 1:30 p.m., SA Cuevas and TFO Fregoso conducted a <u>Mirandized</u> interview of LOPEZ. During the interview, LOPEZ stated that he lives in Tijuana, Mexico, with his girlfriend. According to LOPEZ, he was kidnapped in Tijuana about a month ago by members of CJNG. It was at this point LOPEZ was told by CJNG members that if he did not work for them, they would kill his mother, his girlfriend, and him.[1] LOPEZ disclosed that he was instructed to cross the United States-Mexico border every day, and he did so most days with an empty vehicle. LOPEZ explained that CJNG has drivers cross the border with an empty vehicle to create a pattern with border law enforcement authorities to lessen the chance of being sent to secondary inspection when the vehicle is loaded with drugs.

---

[1] In my training and experience, individuals working for drug-trafficking organizations often fabricate such stories of coercion to minimize their culpability. Further, LOPEZ's later statements about being paid large sums of money and his later statements indicating that he knew significant details about the drug loads he transported are inconsistent with circumstances when drug-trafficking organizations force an individual to work.

27. LOPEZ stated he has crossed the border two or three times with money on behalf of CJNG. Once with $20,000 USD and another with $13,000 USD. LOPEZ then stated that he told CJNG members that he was not receiving payment for the money deliveries. LOPEZ then stated that CJNG told LOPEZ he would not have to do that anymore. They then moved him onto drug deliveries, and LOPEZ explained that the drugs are normally loaded by a male named "Rigo" in Tijuana to be crossed into the United States. LOPEZ claimed he has knowingly crossed the United States border from Mexico with a drug-loaded vehicle four times. As the interview progressed, LOPEZ amended that statement and stated he has crossed the United States border from Mexico with a drug-loaded vehicle six times on behalf of CJNG, one of those times with cocaine instead of methamphetamine.

28. Agents asked where LOPEZ was supposed to go with the load of methamphetamine in V-1 on March 25, 2025, and LOPEZ stated he was to deliver the meth to a particular address in Victorville, California.[2] LOPEZ explained he was supposed to meet with an unknown male who drives a grey Mazda, whom LOPEZ said he has met before. The unknown male then would take V-1 to an unknown location, unload the drugs from V-1, then return the emptied V-1 back to LOPEZ. When asked how much LOPEZ is paid for conducting these deliveries, LOPEZ stated he is paid $5,000 USD cash for each load he crosses. LOPEZ explained he is paid

---

[2] LOPEZ provided the full address, but I have omitted it here.

in cash by the male named "Rigo" in Tijuana. LOPEZ also gave consent to search the SUBJECT DEVICE and stated that the SUBJECT DEVICE has the GPS turned on for the CJNG members to monitor his location and that he messages CJNG members on the SUBJECT DEVICE.

**C.    Drug Test**

29.   BPA Nicole Weiss and BPA in Charge H. Guerra took the 32 bundles from V-1 into the station's evidence room to be weighed and tested. BPA Weiss tested the narcotic utilizing Tru Narc, which returned positive results for methamphetamine. BPA Weiss weighed the bundles and found they collectively weighed 20.5 kilograms.

**V.    TRAINING AND EXPERIENCE ON DRUG OFFENSES**

30.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of

illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

 31. As used herein, the term "digital device" includes the SUBJECT DEVICE.

 32. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

e.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

f.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

33.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. CONCLUSION

34.  For all of the reasons described above, there is probable cause to believe that LOPEZ has committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii): Possession with Intent to Distribute at Least 500 Grams of a Mixture or Substance Containing a Detectable Amount of Methamphetamine. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
Telephone on this 26th day of
March 2025.

_____
HON. DAVID T. BRISTOW
UNITED STATES MAGISTRATE JUDGE

17